NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0580n.06
Filed: August 13, 2007

Nos. 06-1534, 06-1888

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

NORWEST BANK WISCONSIN, N.A.,
N/K/A WELLS FARGO BANK
WISCONSIN, N.A.,

    Plaintiff-Appellant/Appellee,

v.

MALACHI CORPORATION, N/K/A
DORIC CORPORATION,

    Defendant,

EXTENDICARE HEALTH SERVICES,
INC.,

    Defendant-Appellee,

HP MANAGEMENT GROUP, INC.,

    Intervening Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

**Before: SILER and COOK, Circuit Judges; and REEVES, District Judge.**[*]

    **DANNY C. REEVES, District Judge.** This case consists of two consolidated appeals from district court orders in a receivership proceeding initiated by Norwest Bank Wisconsin, n/k/a Wells Fargo Bank Wisconsin ("Norwest Bank" or "the Trustee"), against Malachi Corporation, n/k/a Doric

---

[*] The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

-1-

Corporation ("Malachi").[2] In the first appeal, Norwest Bank appeals from an order in which the district court concluded that it was responsible for the 2003 real estate taxes covering a nursing home purchased by Extendicare Health Services, Inc. ("Extendicare" or "the Buyer") and finding that Extendicare was entitled to receive a Medicaid reimbursement. In the second appeal, HP Management Group, Inc. ("HP") contests an order granting the distribution of funds from the receivership estate to bondholders. For the reasons set forth below, we AFFIRM the district court's orders.

## BACKGROUND

Norwest Bank was the Trustee to six separate bond financing transactions used by Malachi to purchase seven nursing homes. After Malachi defaulted on the financing, the Trustee initiated this receivership action against Malachi on March 23, 1999, in the district court for the Eastern District of Michigan. On March 31, 1999, the district court appointed HealthLink Services, LLC ("the Receiver") as the Receiver and authorized the Trustee to advance funds to the Receiver to pay the operating expenses of the nursing homes. The Receiver entered into contracts with HP to manage the nursing homes.

### I. Facts Related to the Trustee's Appeal (06-1534)

In November 2002, the district court approved the sale of one of the nursing homes, the River's Bend Health and Rehabilitation Center located in Manitowoc, Wisconsin ("the Manitowoc facility"), to Extendicare pursuant to an Asset Purchase Agreement. At the time of the December 31, 2003, closing, a dispute arose between the Trustee and the Buyer regarding who was responsible for payment of the 2003 real estate taxes. Notwithstanding this dispute, the parties closed on the sale

---

[2] Malachi is not a party to the instant appeal.

of the Manitowoc facility. However, shortly afterward, the parties had another dispute regarding who was entitled to receive a Medicaid reimbursement for a retroactive rate increase for services rendered at the nursing home. On July 30, 2004, the Receiver filed a motion requesting that the district court determine an entitlement to assets with respect to the 2003 property taxes and the Medicaid reimbursement.

On February 21, 2006, the district court issued an Order finding that the 2003 taxes were "due" in December 2003 when the taxes were levied and were the responsibility of the Trustee. In addition, the court concluded that, based on the clear language of the Asset Purchase Agreement, the parties allocated the risks and benefits of all retroactive rate adjustments – positive and negative – to the Buyer and, therefore, the Buyer was entitled to the Medicaid reimbursement.

## II.     Facts Related to HP's Appeal (06-1888)

In 1999, the Trustee made operating advances for each of the receivership estates and, in return, the Receiver executed and delivered promissory notes to the Trustee ("the Trustee Notes"), pledging repayment of these advances. As part of the receivership proceedings, the district court directed the Receiver to takes steps to sell each of the nursing homes, deposit the sale proceeds in separate custodial accounts for the respective receivership estates, and file an accounting with the court. On April 8, 2005, the Trustee filed a motion to compel payment of the Trustee notes, asserting that the Receiver had filed final accountings in the Redford and Princeton Receivership Estates. In addition, the Trustee filed motions for the disbursement of funds to bondholders of three facilities that had been sold.

HP objected to the Trustee's motions for disbursements and payment of the Trustee Notes, arguing that its claim for alleged operating advances had priority over the Trustee's requests for

payment. Notably, at this time, the Trustee had commenced a separate action against HP for conversion of funds (*Wells Fargo Bank, as Trustee v. HP Management*, Case No., 03-30340 (E.D. Mich.)) after it suspected that HP had diverted millions of dollars from the Receivership Estates during the time it was the manager of the nursing homes.

After conducting a hearing on the motions, the court granted, in part, the motion for disbursement of funds but denied the motion for payment of the Trustee Notes. HP filed a motion for reconsideration of the distribution order. The district court denied that motion on May 22, 2006.

## STANDARD OF REVIEW

In a receivership proceeding, a district court has "broad powers and wide discretion" in crafting relief. *S.E.C. v. Basic Energy & Affiliated Res. Inc.*, 273 F.3d 657, 668 (6th Cir. 2001). As a result, a district court's decision relating to the choice of distribution plan for the receivership is reviewed for abuse of discretion. *Liberte Capital Group, L.L.C. v. Capwill*, 148 F. App'x. 426, 433 (6th Cir. 2005) (unpublished) (citing *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 87 (2d Cir. 2002)). Because both orders subject to this appeal distributed assets from the receivership, we review the orders for an abuse of discretion.

## DISCUSSION

### I.      The Trustee's Appeal

#### A.      Jurisdiction

The Buyer asserts that this Court does not have jurisdiction over the Trustee's appeal under 28 U.S.C. § 1292 or 28 U.S.C. § 1291. Title 28 of the United States Code, Section 1292(a)(2), permits appeals from interlocutory orders "appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other

-4-

disposals of property." 28 U.S.C. § 1292(a)(2). Because the district court's order directed the disposal of receivership assets and, therefore, changed certain aspects of the receivership, the order is appealable under 28 U.S.C. § 1292. *See Santibanez v. Wier McMahon & Co.*, 105 F.3d 234 (5th Cir. 1997) (holding that an order which appointed a receiver and directed the sale and disposal of property is an appealable, interlocutory order).

Further, the order is appealable under 28 U.S.C. § 1291 *via* the collateral order doctrine. This doctrine was first recognized by the Supreme Court in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949), and allows this Court, pursuant to § 1291, to review a narrow class of decisions that do not terminate the litigation, but are sufficiently important and collateral to the merits that they should nonetheless be treated as final. *Will v. Hallock*, 546 U.S. 345 (2006). Before the collateral order doctrine will apply, the order in question must: "(1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment." *Id*. at 349 (internal quotation marks omitted). Here, the district court's order finally determined the manner in which certain receivership assets should be distributed and these issues were separate from the merits of the Trustee's claim against Malachi. Further, the distribution order will likely be unreviewable on final appeal because these assets will have been distributed, and likely unrecoverable, at such time as the action filed by the Trustee is subject to appellate review. *See, e.g., Basic Energy*, 273 F.3d 657.

### B. Analysis

#### 1. Real Estate Taxes

In Wisconsin, real estate taxes levied in one year must be paid in full by January 31 of the following year. However, under Wisconsin law, the burden of taxation is imposed at the time of

assessment or levy. *See Matter of Estate of Karrels*, 435 N.W.2d 739, 741 (Wis. Ct. App. 1988) (citing *State ex rel. Columbia Constr. Co. v. Tax Comm'n*, 165 N.W. 382 (Wis. 1917)); *Nelson v. Gunderson*, 207 N.W. 408 (Wis. 1926) (reassessment of real estate taxes imposes a lien against the property as of the date of the original assessment). Real estate taxes are deemed "levied" when the tax roll has been delivered to the tax district treasurer. Wis. Stat. § 70.01 (2004). At that point, the taxes become a lien on the property dating back to January 1 of the year of the levy. *Id*.

At the December 31, 2003, closing, the parties disagreed regarding responsibility for payment of the 2003 property taxes, assessed in the amount of $85,985. Although these taxes were due on January 31, 2004, they were levied on either December 8 or December 15, 2003. Wis. Stat. § 74.03 (2004) (depending on the policy that the taxing district has in place, the tax roll must be delivered to the treasurer of the tax district on either December 8 or the third Monday in December). On the date of the levy, the 2003 property taxes became a lien upon the Manitowoc facility dating back to January 1, 2003. Although title to the Manitowoc facility passed to the Buyer on December 31, 2003, the taxes were a burden on the property prior to that date.[3] Because the 2003 tax obligation

---

[3]     The parties reference Section 2.10 of the Asset Purchase Agreement, which provides that:

> <u>Prorations</u>. Except as specifically set forth herein, general taxes for the year of closing, based on the most recent mill levy and assessment of the Project, water and sewer changes, any owner's association dues, and any other ongoing, continuous expenses of operating the Project which are customarily prorated in commercial sales of real property, shall be prorated to the Closing Date. Taxes shall be prorated on a "due date" basis. All Project income and reimbursement rights shall be prorated as of the Closing Date.

This provision governs the proration of property taxes but it has no effect in this case. The closing on the Manitowoc facility occurred on December 31, 2003, the last day of the taxable year. As such, the Trustee enjoyed the use and benefit of the property for all of 2003 and was not entitled to any offset in the amount of taxes it was required to pay.

was incurred on either December 8 or December 15, 2003, prior to the date title to the facility passed to the Buyer, we affirm the district court's conclusion that the Trustee was responsible for the taxes.

## 2.    Medicaid Reimbursement

The Manitowoc facility was a participant in the Wisconsin Medicaid program, which allowed the state to mandate the rate the facility could charge Medicaid patients for services. In Wisconsin, Medicaid payments and their rates run from July 1, of one year to June 30, of the following year. When the Manitowoc facility was sold in December 2003, interim Medicaid rates were in effect. In 2004, the Medicaid rates were adjusted to a higher level than the interim rates. Therefore, the Manitowoc facility was entitled to a retroactive rate increase for the period July 1, 2003, to December 31, 2003. In May 2004, the State of Wisconsin issued a check to the Manitowoc facility for the Medicaid reimbursement in the amount of $145,430.30.[4]

Under Minnesota law,[5] if the terms of a contract are clear and unambiguous, a court must interpret the contract in accordance with its plain meaning. *See Knudsen v. Transp. Leasing/Contract, Inc.*, 672 N.W.2d 221, 223 (Minn. Ct. App. 2003). The terms of a contract will not be considered ambiguous simply because the parties disagree regarding the proper interpretation of the terms. *Id.* (citing *Ferrell v. Dunescape Beach Club Condos. Phase I, Inc.*, 751 N.E.2d 702, 709 (Ind. Ct. App. 2001)). "[W]hen a contract is unambiguous, a court gives effect to the parties' intentions as expressed in the four corners of the instrument." *Id.* Moreover, "parol evidence is

---

[4]    The Buyer initially received a check in the amount of $178,691.58. However, it submitted checks to the Receiver to pay other, uncontested Medicare/Medicaid claims for the July 1, 2003, to December 31, 2003, period. After payment of those claims, the Buyer retained the remaining amount of $145,430.30.

[5]    While the Asset Purchase Agreement provides that contract provisions therein are governed by Minnesota law, the manner in which real estate taxes are assessed and the way in which the Medicaid program operates are derived from the substantive law of Wisconsin.

inadmissible to vary the terms of a written contract, absent incompleteness or ambiguity of the contract." *H.J. Kramer Plumbing & Heating, Inc. v. Scharmer*, 386 N.W.2d 742, 747 (Minn. Ct. App. 1986) (citing *RJM Sales & Marketing, Inc. v. Banfi Prod. Corp.*, 546 F. Supp. 1368, 1374 (D. Minn. 1982)).

In the present case, although the parties disagree regarding the interpretation and meaning of Section 7.4 of the Asset Purchase Agreement, they agree that this provision is clear and unambiguous.[6] Section 7.4 of the Asset Purchase Agreement provides that:

> No Indemnification. Buyer acknowledges that it has not claim for reimbursement of indemnification against the Trustee in connection with any of its costs associated with the completion of its due diligence or inspection of the Project. Buyer acknowledges that it is purchasing the Project subject to any Medicare and/or Medicaid reimbursement overpayment claims, charges or recoveries, (collectively "Medicare/Medicaid Recoveries") relative to operation of the Project prior to the Closing, whether in the form of payments made by Buyer or deduction from or curtailment of such reimbursements otherwise payable to Buyer. The Trustee shall have no obligations with respect to any Medicare/Medicaid Recoveries. The Trustee and the Receiver acknowledge that Buyer is acquiring the right to pursue any Medicare and/or Medicaid reimbursement underpayment claims, and that neither the Trustee nor the Receiver shall have any rights with respect to any underpayment recoveries obtained by Buyer.

The plain language of this provision makes it clear that the parties intended to allocate the potential risks and benefits of Medicaid (and Medicare) rate adjustments to the Buyer.

The Trustee argues that the Buyer is not entitled to the Medicaid reimbursement because it did not initiate the claim for the Medicaid reimbursement. However, the fact that the Buyer did not initiate the reimbursement claim has no bearing on the Buyer's entitlement to the funds. Under the

---

[6]     The Trustee argues in the alternative that the term "reimbursement underpayment claims" is ambiguous and that the Court should reverse and remand this matter for introduction of parol evidence. However, because the terms of the agreement are plain and unambiguous, there is no basis for remanding this action in order to introduce parol evidence.

plain language of the agreement, the Buyer was required to bear all risks associated with any negative Medicaid and Medicare rate adjustments but was entitled to receive any corresponding benefit of any positive rate adjustment. The agreement does not limit the Buyer's right to receive underpayment recoveries to those instances when it initiates the claim. Rather, the agreement explicitly states that the "Buyer is acquiring the right to pursue *any* Medicare and/or Medicaid reimbursement underpayment claims" and that the Trustee shall not "have *any* rights with respect to *any* underpayment recoveries." In light of the plain and unambiguous language of the Asset Purchase Agreement, we affirm the district court's determination that the Buyer is entitled to the Medicaid reimbursement.

## II. HP's Appeal

### A. Jurisdiction

The Trustee contends that this Court only has authority to consider the issues raised in the district court's May 22, 2006, Order denying the motion for reconsideration because the notice of appeal does not reference the underlying February 21, 2006, Order. In *Peabody Coal Co. v. Local Union Nos. 1734, 1508 and 1548*, 484 F.2d 78 (6th Cir. 1973), the notice of appeal indicated that the defendants were appealing the denial of a motion for reconsideration but failed to name the underlying contempt or temporary restraining orders, which were the actual contested orders on appeal. In finding that it had jurisdiction to consider the underlying orders, this Court stated that a defect in the notice of appeal "is not fatal where it can be reasonably inferred from the notice of appeal that the intent of the appellant was to appeal from the final judgment, if it also appears that the appellee has not been mislead." *Id*. at 81 (quoting *Lumbermen's Mut. Ins. Co. v. Mass. Bonding & Ins. Co.*, 310 F.2d 627, 629 (4th Cir. 1962) (quotation marks omitted)).

Here, although the notice of appeal only references the motion to reconsider, HP's brief put the Trustee on notice that the actual contested order was the underlying February 21, 2006, Order. Because the Trustee had notice of the issues being appealed, it suffered no prejudice as a result of HP failing to specifically reference the underlying order. Therefore, we are not precluded from reviewing the issues related to that Order.

The Trustee also claims that this Court lacks jurisdiction to consider HP's argument that the district court acted unconstitutionally in failing to establish a procedure for the identification and payment of claims because HP failed to raise this argument before the district court. Absent exceptional circumstances, an appellate court will not consider an argument by an appellant that was not presented to or considered by the trial court. *See, e.g., United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 759 (6th Cir. 1999); *Thurman v. Yellow Freight Sys., Inc.*, 97 F.3d 833, 835 (6th Cir. 1996); *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir. 1996). Here, HP argued before the district court that the Trustee's motions for disbursement and payment of the Trustee notes should be denied because the motions were "premature" and "would prejudice HP and other creditors." In support, it listed eight specific reasons why its claim for alleged operating advances was a first priority over the other claims against the Receivership estate. However, HP did not raise a due process claim regarding the establishment of a claims procedure before the district court. Although we will not consider this argument on appeal, we find, as noted above, that HP has sufficiently preserved for appeal the issues regarding whether the district court abused its discretion in granting, in part, the Trustee's motion to distribute funds to bondholders.

### B.      Analysis

HP asserts that the district court abused its discretion in ordering the disbursement of funds to bondholders. The record reflects that the district court has been presiding over the receivership proceedings for approximately seven years. In ruling on the Trustee's motions for disbursement of funds and for payment of the Trustee Notes, the district court acknowledged HP's concerns that any disbursement would be premature inasmuch as "there [was] a great need for a thorough updating of the accounting in this case." However, recognizing that HP was involved in a separate action for allegedly diverting funds, the district court balanced HP's claims against the interests of the bondholders who "ha[d] been waiting for some time for disbursements of funds to which they are entitled." Ultimately, it decided that the most equitable remedy was to grant the motion for disbursement, in part, but deny the motion for payment of the Trustee notes, stating that, "at the moment, [it was] unable to make a complete and accurate determination of the disposition of all funds."

Having reviewed the record, the district court did not abuse its discretion in ordering a partial disbursement of funds to bondholders. The challenged order clearly falls within the "broad powers and wide discretion" that a district court may utilize in fashioning relief in an equity receivership proceeding. *Basic Energy*, 273 F.3d at 668.

## CONCLUSION

We AFFIRM the district court orders.