NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0100n.06

Nos. 18-3712; 18-3789; 18-3794; 18-3800; 18-3881; 18-3920

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SHELDON GORDON, et al., | ) | **FILED**<br>Feb 13, 2020<br>DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellants, | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| DAVID DADANTE, et al., | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| Defendants | ) | DISTRICT OF OHIO |
| | ) | |
| MARK DOTTORE, | ) | |
| | ) | |
| Receiver-Appellee. | ) | |

**BEFORE:  ROGERS, WHITE, and READLER, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.**  Plaintiffs-Appellants challenge two related orders awarding extra compensation to the Receiver and the Receiver's staff for the extraordinary recovery he achieved on behalf of a group of defrauded investors.  For the following reasons, we **AFFIRM IN PART, REVERSE IN PART,** and **REMAND** for proceedings consistent with this opinion.

### I. Background

On November 21, 2005, Sheldon Gordon brought this action against David Dadante, several entities under Dadante's control,[1] a number of brokerage houses, and various John Doe companies and individuals, alleging violations of the Securities Exchange Act (SEA) of 1934, 15

---

[1] These entities included IPOF, L.P.; IPOF Fund; IPOF II, L.P.; GSI; and GSGI.

U.S.C. § 78j(b), the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962, 1964(c), and state securities laws. In essence, Gordon alleged that Dadante operated an elaborate Ponzi scheme in which Dadante raised some $50 million from Gordon and a group of over 100 investors for a fraudulent and unregistered investment fund ("the Fund"); and that to encourage continued investment in the Fund, Dadante used approximately $26 million of invested funds to pay initial investors "gains" on their investments, although these "gains" were in fact "distributions made from the initial deposits of later investors." R. 447, PID 5442. Nevertheless, the Fund was not entirely without legitimate assets, including nearly 4.3 million shares of common stock in Innotrac Corporation ("Innotrac"). Dadante had acquired this stock by creating margin debts[2] at several of the brokerage firms named as defendants.[3] The acquisition of Innotrac shares through Dadante's margin purchases meant that the Fund owed several million dollars of margin debt, and many of the Fund's accounts at the brokerage firms faced imminent margin calls.

---

[2] The district court explained the concept of margin debt as follows:

> The term 'margin debt' refers to credit extended by a brokerage firm to its client in connection with the purchase of securities (an activity commonly known as 'purchasing on margin'). Margin creates leverage to purchase and hold larger amounts of securities. However, margin debt incurred to purchase securities in an account is secured by the assets in that brokerage account. When the market value of stock and other assets in the account falls below a requisite value in relation to the margin debt in the account, however, a brokerage firm will demand additional funds or assets from the client (this is commonly known as a 'margin call'). If the client does not deposit such funds or assets into the account, the brokerage firm may liquidate the assets in that account to reduce or cover the margin debt. In the event an account is liquidated, the brokerage typically has the right to payment from the client for any debt that remains after such liquidation.

R. 447, PID 5443.

[3] The brokerage defendants included Ferris Baker Watts, Inc.; Wachovia Securities, L.L.C.; H&R Block Financial Advisors, Inc.; Pershing, L.L.C., and Advest, Inc. and/or The Advest Group, Inc.; McDonald Financial Group (a division of KeyCorp); and Merrill Lynch. Defendant Pershing L.L.C. was subsequently dismissed.

To preserve potential assets, Gordon requested an order freezing any assets of Dadante and any affiliated entities; requiring an accounting of all assets; prohibiting any of the brokerage firms from liquidating the Fund's Innotrac stock (in order to satisfy the margin debts); and appointing a receiver to marshal and safeguard the assets during the course of the suit. The district court later appointed Mark Dottore as Receiver and directed him to "locate, identify, freeze and preserve all assets and property of the [Fund]." R. 7, PID 78. The appointment order provided that the Receiver and staff working for him would be entitled to reasonable compensation to be determined "upon terms to be set by future order of the Court." *Id.* at PID 80.[4] The district court's appointment order also required the Dadante defendants and any persons or entities acting under their direction to identify and deliver to the Receiver any Fund property, and enjoined those individuals (or entities) from interfering with the preservation of any Fund property, and from paying any amounts owed to the Fund to anyone other than the Receiver. A subsequent order extended the Receiver's appointment and authority indefinitely and froze all personal assets of Dadante, "any asset of any person or entity with whom David Dadante is affiliated in any way, including by blood[,] marriage or other personal relationship" as well as those individuals' cash holdings, bank accounts, or investment accounts into which transfers have been made. R. 25, PID 299. As a result of this asset freeze, $322,413.00 in appellant Beverly Dadante's[5] Hillcrest Community Credit Union account was frozen.

On December 19, 2006, the Receiver requested permission to resolve claims against Dadante according to an agreement the Receiver had reached with Dadante and members of his

---

[4] Gordon's motion included a proposal that the receiver be compensated at his normal hourly rates and that he submit periodic applications for payment of fees and expenses to the district court for approval. This process was followed after Dottore's appointment.

[5] Beverly Dadante is David Dadante's wife.

family, including Beverly Dadante. The agreement included several relevant parts. First, the parties agreed to submit a stipulated judgment to the court in the amount of $8,500,000 against Dadante on the Fund's claims of breach of fiduciary duty, mismanagement of partnership funds, and constructive fraud. The judgment would dismiss all claims against Dadante with prejudice. In a section entitled "Dadante Interests in IPOF Funds," the Dadantes agreed to "relinquish any and all interest, right, title, or claim in or to any of the IPOF Partnerships[' funds], including, but not limited to, any accounts held in the name of D&D Publishing." R. 166-1, PID 1584. In partial satisfaction of the judgment, Dadante and Beverly Dadante conveyed to the Fund their interest in their home in Gates Mills, Ohio. The agreement also released all but $164,000 of the money in Beverly Dadante's credit union account from the asset freeze orders. The remaining $164,000 was transferred to the Receiver and held in a separate interest-bearing account. Additionally, the parties agreed to release one another from any and all claims. However, paragraph 8D stated that the releases would not extend to any claims that either Beverly Dadante or the Fund have "to funds held in accounts belonging to Beverly Dadante that are currently under the control of the Receiver appointed by the Court." *Id* at PID 1586. On January 9, 2007, the court granted the Receiver's motion to approve the settlement.

Unfortunately, the investors began growing suspicious of each other and of the Receiver. One subset of investors, the Regalbuto parties, later moved the district court to order a full accounting of the Receiver's activities since appointment. When the accusations against the Receiver continued, the Receiver requested that the district court order an independent audit. On June 26, 2009, the district court granted the request and appointed Dr. Thomas Florence and the

4

Analysis Research Planning Corporation (ARPC)[6] as auditors. The auditors were tasked with ensuring that the Receiver's bills were reasonable. The ARPC audit, filed on the docket on November 24, 2009, concluded that "[t]he hourly rates charged by professionals in the case are reasonable" and that such "rates are generally on the low end of the range of rates charged by similar professionals in other cases." R. 482-1, PID 5898. It also concluded that the Receiver's fee requests were well-documented and that "[s]ufficient detail was available to explain all but approximately 1.5% of the amount invoiced in the case." *Id.* at PID 5904.

Between January 2008 and October 2011, the Receiver entered into numerous settlements with the brokerage firms that held the Fund's Innotrac stock. These settlements recovered 4,321,771 shares of Innotrac stock free and clear of any margin debt, and, in many cases, included payments from the brokerage firms to the Fund, which created a pool of assets available for distribution to the investors. Nevertheless, the Receiver still hoped to negotiate a block-sale of the Fund's recovered Innotrac stock so that it could distribute more cash—not stock—to the defrauded investors. As a result, on November 15, 2013, the Receiver sought conditional approval of an agreement with Innotrac and Blue Eagle Holdings, L.P. Like an earlier failed proposal in 2008, the agreement contemplated that Blue Eagle Holdings would merge with Innotrac. As part of the agreement, Blue Eagle Acquisition Sub, Inc. (a wholly owned subsidiary of Blue Eagle Holdings), would purchase all of the issued shares of Innotrac stock for $8.20/share. Given the earlier settlements and the recovery of Innotrac stock free and clear of all claims of margin debt, the Receivership stood to gain $35,438,522 in cash ($8.2 X 4,321,771 shares of Innotrac stock), well

---

[6] Because the report used data gathered by Kennedy Information (later Kennedy Consulting Research & Advisory), this audit has been referred to throughout the proceedings as the Kennedy Report.

in excess of the total net investor loss of around $28 million. On December 17, 2013, during a fairness hearing on the proposed agreement, the district court made the following remark:

> I would anticipate that, Mr. Dottore, based upon this extraordinary recovery in this case that you would be seeking additional compensation. I think you are certainly entitled to that. The Court will decide that in the end.

R. 769, PID 11028. The district court directed counsel for the Receiver to brief whether the district court had the authority to increase compensation for such an extraordinary recovery.[7] The district court granted final approval of the Innotrac/Blue Eagle agreement on December 18, 2013. Because of the large influx of cash occasioned by the sale of the Fund's shares of Innotrac stock, the Receiver soon sought court approval to distribute the cash proceeds, giving each investor 110% of the total amount invested.

On June 20, 2014, the district court issued an order holding that "it has the authority to adjust the compensation of the Receiver to reflect a reasonable hourly rate in light of the obstacles encountered during the pendency of the receivership and the recovery achieved." R. 612, PID 9614. The court noted that determination of any compensation award should begin with the lodestar method and that it had the discretion to adjust the hourly rate used in that method to "reflect a reasonable rate in relation to the market and in consideration of the results achieved." *Id.* at PID 9615. Instead of relying on the Receiver's own determination of what a reasonable rate would be, the district court ordered the Receiver to obtain an updated Kennedy Report on the hourly rates for receivers and staff for the duration of the Receivership. The updated report was filed on June 25, 2014. In response, Gordon and another investor filed a competing expert report

---

[7] The Receiver responded to the district court's request by filing a brief on March 3, 2014, setting forth his belief that district courts possess broad discretion to set Receiver compensation, which may include adjusting the fee to account for the results obtained. The district court later provided any party the opportunity to be heard on this issue, and various investors filed objections arguing that the district court's proposed award of additional compensation was improper.

from John Lane, a receiver, that challenged the Kennedy Report and concluded that the rates charged by the Receiver and his staff were at the high end of the rates that would be considered reasonable for the community.

Following the sale of the Innotrac stock, only two issues remained to be decided before the case could be resolved: "the dispute over fees incurred by the Receiver" and the "Court's intent of increasing the compensation paid the Receiver in light of the Kennedy Report's conclusions on the hourly rate paid Receivers in general." R. 755, PID 10938.[8] The district court later referred these issues to a magistrate judge for a Report and Recommendation ("R&R") and directed the Receiver to file an updated accounting. On October 31, 2017, the Receiver filed a new accounting and a fee application for the period from January 6, 2014 through September 30, 2017. The Receiver requested a total of $791,406.57, based on his previously approved rates.

On February 1, 2018, the magistrate judge issued the R&R on these two issues. As to the request for billed-but-unpaid fees, the magistrate judge recommended that a total of $106,608.50 be deducted from the Receiver's fee request, consisting of $13,801.00 in Receiver's fees and $92,807.50 in fees incurred by the Receiver's counsel. These reductions were due largely to the Receiver and his counsel's request for fees for time spent responding to the district court's request for briefing on whether the court had authority to increase the Receiver's compensation. On the merits of the request for additional compensation, the R&R agreed that extra compensation should be awarded. Relying on a line of Supreme Court cases providing that, in certain exceptional cases,

---

[8] Although Gordon and the investors originally brought a number of substantive claims, this case quickly evolved into an asset-hunt for the Receivership. Following the settlement with Dadante and the brokerage firms, counsel for Gordon indicated that because of the Receiver's recoveries, Gordon intended to dismiss his claims. On August 21, 2017, he filed a notice of partial dismissal, dismissing all but two of the original claims alleged in the First Amended Complaint. Because the other two claims provided the grounds for the Receiver's appointment, Gordon preserved those claims but stated that he would move to dismiss them at the conclusion of the Receivership.

a fee enhancement to the lodestar (amounting to no more than one-third of the lodestar value) may be justified, the R&R recommended an additional compensation award of one-third of the Receiver's total billings, which amounted to an additional fee of $1,203,175.[9]

After numerous parties—including the Receiver—objected to the R&R, the district court entered an order ("Order 1") adopting the R&R in part and modifying it in part. On the issue of outstanding fees, the district court adopted the R&R and agreed that $13,801.00 should be reduced from the Receiver's bill and $92,807.50 should be reduced from the Receiver's counsel's bill for the period from 2014-2017. The district court awarded $777,605.57 to the Receiver and his staff[10] and $811,436.41 to the Receiver's counsel for billed-but-unpaid fees incurred during this period. The district court rejected the investors' objections to any additional compensation and agreed with the R&R that this was an exceptional case warranting an increase in compensation. It determined that the "Receiver's efforts warrant an increase in compensation to the high end of the average hourly rate for management consultants as outlined in the ARPC 2014 Updated Report." R. 839, PID 12400. The district court then determined a "reasonable" rate by calculating the average hourly rate for the Receiver ($459/hr) and his staff ($274/hr) for the years 2006-2017. After performing the relevant calculations, the district court determined that the Receiver and his staff were entitled to increased compensation in the amount of $2,424,049.42.[11] Because these were the last two issues to be resolved before the Receivership could be wound up, the order

---

[9] The magistrate judge calculated that the Receiver and his staff had spent 17,296.9 hours on this case and had approximately $4,010,585.32 in approved billings.

[10] These fees were based on the hourly rate the Receiver and his staff were charging when the fees were incurred and not on the later adjusted rate the district court used to determine the additional compensation.

[11] The amount of extra compensation was determined by multiplying the average "high" hourly rate (using the Kennedy Report's numbers) by the total number of hours billed and subtracting the amount that had already been awarded.

directed the Receiver to pay himself and his staff for billed-but-unpaid fees ($777,605.57) and the amount of additional compensation and then "distribute the remainder of the assets of the Receivership on a pro rata basis as previously established to the investors." *Id.* at PID 12401. Within thirty days of making these distributions, the Receiver was required to file his Final Report of the Receivership with the court. *Id.*

Several investors immediately filed a notice of appeal. Contemporaneously with the filing of that notice, they sought to stay Order 1 pending appeal. The Receiver opposed the motion, contending that there was no threat of irreparable harm should the court deny the stay because the "possibility that the Receiver would not return the funds to the Court would be remote." R. 842, PID 12422. On August 17, 2018, the district court directed the Receiver to place the $2,424,049.42 into an interest-bearing escrow account pending appeal and denied the motion to stay as moot ("Order 2"). Additionally, because Order 1 had not addressed certain of the investors' arguments that the $777,605.57 awarded for billed-but-unpaid fees included amounts that had already been paid, the district court ordered the Receiver "to review and credit the account against the amount awarded for any fees of which he was already paid and inform the Court by filing a response by August 24, 2018." R. 852, PID 12515. It does not appear that the Receiver made such a filing.

Three groups of investors ("Fee Objectors") and Beverly Dadante appealed Order 1, and two of those groups also appealed Order 2. Following consolidation, the Receiver moved to dismiss the appeals for lack of jurisdiction.

## II. Jurisdiction

We first consider our jurisdiction. We have jurisdiction to hear this appeal under the collateral order doctrine, which permits appeal from a "small class" of "district court decisions that, though short of final judgment, are immediately appealable because they 'finally determine

claims of right separable from, and collateral to, rights asserted in the action.'"  *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) (quoting *Cohen v. Beneficial Indust. Loan Corp.*, 337 U.S. 541, 546 (1949)).  Three conditions must be satisfied before the collateral order doctrine applies. The order must "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment."  *Will v. Hallock*, 546 U.S. 345, 349 (2006) (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993)).

We have held that the collateral order doctrine applies in similar cases where a district court's order conclusively determined the final disposition of certain disputed assets of a receivership estate.  *See, e.g.*, *S.E.C. v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 667 (6th Cir. 2001); *Norwest Bank Wis., N.A. v. Malachi Corp.*, 245 F. App'x 488, 492 (6th Cir. 2007). Order 1 directs the Receiver to pay himself the determined amount of fees and additional compensation, to distribute the remainder of the Receivership estate's assets on a pro rata basis, and to file his Final Report within 30 days of distribution.  Order 1 does not contemplate revision or modification, and conclusively determines the fee issues—issues separate from the merits of the underlying action.  We have also determined that orders directing the distribution of assets qualify as effectively unreviewable on appeal because of the danger that the assets, subject to distribution before appellate review, may be hard—if not impossible—to recover.  *See, e.g.*, *Basic Energy*, 273 F.3d at 666; *see also Ruggles v. Patton*, 143 F. 312, 314 (6th Cir. 1906) ("The fact that he was then the court's receiver, and that he continued to be the court's receiver, gave the court no more authority to call back a fund which he was directed to pay to himself, in the absence of a reservation to that effect, than it could exercise over any other party obtaining funds through

an order of the court."). Because the requirements of the collateral order doctrine are met, we may review Orders 1 and 2.

### III. Discussion

### A. Fees

### 1. Additional Compensation

Compensation awarded to a Receiver is, like the issue of attorney's fees, reviewed for abuse of discretion. *Chase Nat'l Bank v. Malone*, 90 F.2d 1002, 1003 (6th Cir. 1937); *Binta B. ex rel. S.A. v. Gordon*, 710 F.3d 608, 618 (6th Cir. 2013). "An abuse of discretion exists when the district court applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Geier v. Sundquist*, 372 F.3d 784, 789-90 (6th Cir. 2004) (quoting *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 647 (6th Cir. 1993)). The court may also find an abuse of discretion where it is "firmly convinced that a mistake has been made." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000) (quoting *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560 (6th Cir. 2000)).

Although there is not an extensive body of law on receiver compensation, the Supreme Court has confirmed the "power of courts of equity to fix the compensation of their own receivers" and that the "matter is left entirely to the determination of the court from which he derives his appointment." *Stuart v. Boulware*, 133 U.S. 78, 82 (1890). Notwithstanding this broad discretion, the Supreme Court has cautioned that "judges of the courts, in fixing allowances for services to court officers, should be most careful, and that vicarious generosity in such a matter could receive no countenance." *In re Gilbert*, 276 U.S. 294, 296 (1928).

The district court abused its discretion by retroactively increasing rates that had already been approved as reasonable. The district court recited several bases for its decision to award additional compensation. Even in tandem, these reasons are insufficient.

First, the district court's reliance on the line of cases establishing the discretion of district courts to fix the compensation of receivers is misplaced. Those cases primarily deal with district courts setting a reasonable amount of compensation for attorney's fees or court-appointed officers using the lodestar method at the conclusion of the proceedings. The cases do not support a court's broad discretion to revise previously set rates that had already been determined to be reasonable and awarded to the receiver. On this point, we agree with the district court in *Maiz v. Virani*, No. 3:00-MC-0001, 2003 WL 22995233 (N.D. Tex. Nov. 24, 2003). There, at the conclusion of a receivership, the district court considered a receiver's request for a "final fee" of approximately $2 to $3 million in addition to the monthly fees he had received pursuant to the agreed-to monthly fee arrangement. *Id.* at *2. This additional amount was requested "due to the success of the receivership." *Id.* While recognizing its discretion to set a fair and reasonable fee, the district court determined that it could not locate any authority that would allow it to award a final fee because of the receivership's success where the receiver had already received fair and reasonable fees throughout his appointment. *Id.*

Next, the district court relied on the many difficulties the Receiver faced throughout the fourteen years that this case had been pending, including attempts by the various brokerage firms to call in margin debt or force the sale of the Innotrac stock, and attempts by investors to do the same or to end the Receivership through, in part, contentious hearings and physical confrontations. The district court determined that these events "needlessly increased the expense of the Receivership and required the Receiver to defend not only his professional actions, but personal

integrity as well, warrant[ing] an increase in compensation." R. 839, PID 12390. But the Receiver's expenses were covered and his fees paid during these events and the Receiver never once asked for an increase in his rates or argued that the customary rates he charged (and periodically increased)[12] during this time were unreasonable (or rendered unreasonable) because of these events.

Finally, the district court found that the "independent report of ARPC demonstrates the Receiver's hourly rates fall well below the upper tier rates. Given the Receiver's achievements in this matter, the Court concludes it is reasonable to increase the Receiver's rates to what is appropriate for upper level comparable management." *Id.* at PID 12391. Again, the district court overlooked that the Receiver never requested additional compensation or argued that his rates were unreasonable. To the contrary, he set his own rates throughout the proceedings. Further, this rationale fails to accord sufficient weight to the appointing judge's direction that "[t]he Receivership's fees are hourly, and not contingent," R. 361, PID 4322, and to the district court's own recognition that "the appointing Judge had already necessarily determined those fees were reasonable when she authorized payment of the fees to the Receiver upon application," and that

---

[12] For example, the Accounting Reports reflect that the Receiver billed at the following increasing hourly rates:

- February 2006: $205
- January 2007: $215
- March 2008: $225
- January 2010: $250
- April 2011: $265
- January 2012: $280
- January 2014: $295
- September 2017: $325

revising those decisions would be "inappropriate," R. 839, PID 12394, 12398.[13]   Although ensuring fair and reasonable compensation to the Receiver for his services is an important objective, a district court, sitting in equity, must also "endeavor to determine that all fee payments to the Receiver, his staff and his professionals, are fair and reasonable to all parties under the facts and circumstances that these services were rendered." *Maiz*, 2003 WL 22995233, at *1.

It is neither fair nor reasonable to all parties to retroactively adjust bills that had already been submitted, litigated, approved, and paid years before.  Yet, that is what Order 1 does in awarding additional compensation to the Receiver by retroactively raising the rates charged from the beginning of the Receivership.  The extent of the increase confirms our conclusion.  The average "high" hourly rate used by the district court to calculate the additional compensation for the Receiver was $459/hr for the years 2006-2017.  The district court then multiplied this average by the total number of hours spent by the Receiver on this litigation.  This method more than doubled the Receiver's compensation for certain years; the district court's revised average hourly rate is more than double the rate charged by the Receiver in 2006, 2007, and 2008.  The Receiver's success does not justify more than doubling rates that the Receiver himself set and that were deemed reasonable by the previous district court judge.

However, the district court was within its discretion to increase the rates of the Receiver and his staff for billings incurred from March 3, 2014, the date the Receiver first asked the court to enter an order increasing his compensation.  As to these hours, the district court afforded the investors numerous opportunities to be heard and to submit documentation challenging the

---

[13] Because this case has been pending for over fourteen years, it has been presided over by two district court judges.  The first, the Honorable Kathleen O'Malley, appointed the Receiver and approved many of the Receiver's initial fee requests.  In 2011, upon Judge O'Malley's elevation to the United States Court of Appeals for the Federal Circuit, this case was reassigned to the present district court judge.

supplemental Kennedy Report's conclusions that the Receiver's charged rates were on the low-end of the rates charged by similarly situated professionals.  Even after determining that the court had the discretion to increase the Receiver's rates "to reflect a reasonable hourly rate in light of the obstacles encountered during the pendency of the receivership and the recovery achieved,"  R. 612, PID 9614, the district court referred the matter to the magistrate judge for additional hearings to determine how the additional compensation should be calculated, and then reviewed de novo the investors' objections to the R&R, ultimately determining that a reasonable rate would be the average high hourly rate for Principal Partners as reflected in the Kennedy Report.  Given the discretion afforded district courts to ensure reasonable compensation for the Receiver and the Kennedy Report's conclusion that the charged rates were on the low end of the rates charged by similarly situated professionals, the district court did not abuse its discretion by increasing the rates of the Receiver and his staff for this period.  We remand to allow the district court to calculate the appropriate amount of additional compensation for the Receiver and his staff at the new hourly rates from March 3, 2014 through September 2017.  That calculation should exclude any hours that the district court later deemed non-compensable for other reasons.

In sum, we reverse the part of Order 1 that retroactively awarded additional compensation to the Receiver and his staff for fees incurred from 2006 to March 3, 2014.  However, we affirm the increase in rates beginning on March 3, 2014, and remand to allow the district court to calculate the correct amount of additional compensation.  The district court's interest award should be adjusted accordingly.

## 2. Unpaid Fees

A subset of the investors also contend that the district court erred by declining to reduce the amount awarded for billed-but-unpaid fees the Receiver, his staff, and his counsel sought in

the Receiver's fee application for the period from January 2014 through September 30, 2017. At bottom, the investors contend that the Receiver's bills are vague and block billed, making it hard to determine whether the tasks were properly compensable.

These investors made the same objections below, attaching exhibits highlighting time entries they contended were "directly related to the bonus advocacy" or were "vague (and therefore [might] be charges for such work)." R. 807, PID 11687. In response to their objections, the magistrate judge directed the Receiver to submit documentation detailing all work performed by him, his staff, or his counsel related to the issue of additional compensation. The Receiver identified time entries totaling $57,797.00 in fees related to this matter. In a 96-page Report and Recommendation, the magistrate judge agreed with the investors that the Receiver and his counsel should not be compensated for fees incurred for work performed addressing the matter of additional compensation. However, after scrutinizing the disputed billing entries, the magistrate judge found that "[w]ith regard to the majority of these entries, the Court is not persuaded the activities described in these entries, in fact, relate to the Receiver's request for additional compensation." R. 826, PID 12209. The magistrate judge agreed with the Receiver that most of these entries "involved research and other work relating to the Receiver's proposed plans to distribute approximately $25 million from the [Fund]." *Id.* at PID 12209-10. However, the magistrate judge did recommend deductions for fees the Receiver and his counsel incurred obtaining and reviewing the Kennedy Report and responding to the investors' objections to the Fee Application. Thus, the magistrate judge recommended a total decrease in the Receiver's Fee

Application of $66,608.50, consisting of $13,801.00 in fees incurred by the Receiver and $52,807.50 in fees incurred by the Receiver's counsel.[14]

The investors objected to the R&R, contending that the magistrate judge "fail[ed] to conduct a sufficient analysis of the reasonableness of the hours expended" because the R&R did not "analyze each timekeeper on the Receiver's bills; the tasks charged by each person; and whether or not the time charged and rate for that timekeeper/task is reasonable." R. 828, PID 12298. The district court reviewed the investors' objections to the R&R de novo, finding their contention that the magistrate judge did not thoroughly review the records to be meritless. On appeal, the investors contend that the district court erred by not further reducing the Receiver's fees because the entries are "so vague as to be incapable of demonstrating reasonable and compensable work for the benefit of the Receivership Estate and the investors." Small Br. at 46-47.

We review for an abuse of discretion. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 551 (6th Cir. 2008). Under this deferential standard of review, the district court did not abuse its discretion by not further reducing the bills for the Receiver, his staff, and his counsel. On appeal, the investors provide only one example that they claim demonstrates how the district court "disallowed some billings obviously related to the bonus issue, but approved payments of similar entries." Small Br. at 47. They contend that the district court did not compensate the Receiver and his counsel for the November 16, 2017 supplemental hearing on compensation issues but did not similarly deduct for billings for a hearing on April 24, 2014. Unlike the November 16, 2017,

---

[14] The R&R recommended that the Receiver's counsel's bills be reduced by an additional $40,000 because he failed to justify a sudden $100/hr increase in his fees for June 2014. Although the Receiver's Fee Application included billings for his counsel in addition to billings for the Receiver and his staff, the district court awarded additional compensation only to the Receiver and his staff.

hearing, however, which was entirely dedicated to the matter of additional compensation, the April 2014 hearing centered on a number of issues, including the Receiver's motions to distribute funds and for court approval of a settlement agreement with Wells Fargo;[15] the investors' motions to withhold distributions to a particular Fund investor; the status of litigation against certain brokerage firms; and Beverly Dadante's repeated motions for release of $164,000 being held by the Receiver. Although the matter of additional compensation was discussed during this hearing, the Receiver addressed this matter only in response to various investors' objections during that hearing to the court's proposal to award the extra compensation. On balance then, it was not unreasonable to allow the Receiver and his counsel to bill for that hearing.

As the appointing judge observed, the district court's task is to ensure reasonable compensation to the Receiver and not to "fly-speck" each line item of a Receiver's bills for a fourteen-year period. *See, e.g.*, R. 447, PID 5484. Because the record reflects that both the magistrate judge and the district court thoughtfully considered the bills and the investors' objections thereto and determined them to be without merit, we find no abuse of discretion in the district court's decision. *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 702 F. App'x 408, 413 (6th Cir. 2017) (finding no abuse of discretion where "court's opinion as a whole indicates that the court in fact carefully reviewed the billing records"). We affirm Order 1 with respect to that issue.[16]

## B. Beverly Dadante

At the outset of this litigation, the district court froze all the Dadantes' assets, including Beverly Dadante's Hillcrest Community Credit Union bank account containing approximately

---

[15] Wells Fargo acquired Wachovia in 2008.

[16] Of course, in accordance with the district court's previous order, the Receiver must deduct from this sum any sums that have already been paid to the Receiver or his staff.

$322,413.00. By agreement with the Receiver and with the approval of the district court, all but $164,000 of that money was released from the court's freeze order. The remaining $164,000 was transferred to the Receiver and placed in an interest-bearing account. As part of the agreement, Beverly Dadante agreed not to pursue her appeal challenging the appointment of the Receiver, subject to the understanding that she had not waived her right to "object (even by appeal, if necessary) to the Court's ultimate order(s) of distribution of assets, once that phase of the litigation arrives." R. 58, PID 498. She now contends that the district court's order directing that the remaining assets, including the $164,000 held by the Receiver, be distributed to the investors on a *pro rata* basis qualifies as the court's ultimate order of distribution. We agree and proceed to the merits of her appeal.

Mrs. Dadante initially argued in the district court that the $164,000 could be traced to legitimate sources, including to her 2005 sale of a house in South Euclid, Ohio. After the Receiver presented evidence that "the vast majority of the funds used to purchase the [South Euclid] house came from stolen IPOF Funds," R. 649, PID 9944, she abandoned that argument and instead argued that the common-law one-satisfaction rule prevents the Receiver from retaining any of her funds since the Receivership recovered more than $8.5 million, the stipulated amount of the judgment against Dadante. On appeal, Mrs. Dadante principally contends that the subsequent recovery satisfied the entirety of Dadante's judgment amount and that "David Dadante and Beverly Dadante owe[] nothing more to the Plaintiffs or the Receiver." Beverly Dadante Br. at 8. She also contends that "neither the Receiver nor the Plaintiffs had asserted any independent claim to the $164,000." *Id.* The Receiver and the Fee Objectors contend that the one-satisfaction rule does not entitle Mrs. Dadante to the release of this money because that rule applies only to situations involving joint tortfeasors.

### *Whether the one-satisfaction rule applies*

Mrs. Dadante argues that under the one-satisfaction rule, the investors are entitled to recover the $8.5 million owed by David Dadante only once, regardless of the source of the payment. In support, she cites various secondary sources and a few cases that she contends support her position that the assets recovered by the Receiver on behalf of the defrauded investors should be credited against the $8.5 million judgment owed by Dadante. A review of those sources indicates that her reliance on the one-satisfaction rule is misplaced.

For instance, Mrs. Dadante cites the Restatement (Second) of Judgments in support of her argument that "[it] makes no difference whether payment comes from the judgment debtor or some other source." Beverly Dadante Br. at 12 (citing Restatement (Second) of Judgments § 50 (Am. Law Inst. 1982)). But the section she cites supports the Receiver's argument that the one-satisfaction rule does not apply to her. That section is entitled "Discharge of Judgment Against One of Several Co-Obligors." The cited section reads:

> When a judgment has been rendered **against one of several persons each of whom is liable for a loss** claimed in the action on which the judgment is based:
>
> . . .
>
> (2) Any consideration received by the judgment creditor in payment of the judgment debtor's obligation discharges, to the extent of the amount of value received, the liability to the judgment creditor of **all other persons liable for the loss**.

Restatement (Second) of Judgments § 50(2) (Am. Law Inst. 1982) (emphasis added).

Mrs. Dadante also cites an entry from *Corpus Juris Secundum* explaining that "[a] judgment debtor always receives credit for any sums paid by third parties." 50 *Corpus Juris Secundum* § 880 (2014). However, that entry cites a Seventh Circuit decision, *Scavenger Sale Investors v. Bryant*, 288 F.3d 309 (7th Cir. 2002), which in turn cites back to the same provision in the Restatement (Second) of Judgments quoted above.

That is why the cases applying the one-satisfaction rule involve joint tortfeasors or co-obligors. For example, in *Hess v. Norfolk Southern Railway Co.*, the Ohio Supreme Court described the doctrine as follows:

> It is well established at common law that apart from the collateral-source rule, a partial satisfaction received from one of two joint tortfeasors serves to diminish the liability of the nonsettling defendant. *Dobbs*, supra, at 1082-1085, Section 388 (credits to nonsettling tortfeasors); 3 Harper, James & Gray, The Law of Torts (1986) 36-37, Section 10.1 (earlier satisfaction by one cotortfeasor reduces liability of others).

835 N.E.2d 679, 686 (Ohio 2005). In addition, the Receiver cites our decision in *In re Foote Memorial Hospital/Patient Care Information System Litigation*, 25 F.3d 406 (6th Cir. 1994), where we described the doctrine in a similar way:

> The parties and the district court have also referred to the 'one satisfaction rule,' which provides that a nonsettling defendant is entitled to an offset in the amount of the settlement between a settling defendant and the plaintiff. *United States Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1236 (10th Cir. 1988). A limitation upon the application of this rule, of course, is that the nonsettling defendant is only entitled to the offset if the judgment and the settlement relate to common damages.

*Id.* at 410. A review of these sources demonstrates that the doctrine is applicable in cases involving one or more joint tortfeasors or co-obligors who collectively owe a sum to another for a common injury.

Arguing for a broader construction of the rule, Mrs. Dadante contends that another case, *Lewin v. American Export Lines, Inc.*, 224 F.R.D. 389 (N.D. Ohio 2004), supports her position that the doctrine is not limited to joint tortfeasors or non-settling defendants. She quotes a portion of the opinion that provides that the logic behind the one-satisfaction rule is that "a plaintiff is entitled to be fully compensated for his injury without receiving unjust enrichment." *Id.* at 395. That quoted portion, however, follows immediately after the court explains that because unjust enrichment is to be avoided, the law generally provides that "when a plaintiff settles with one of

several joint tortfeasors, the nonsettling defendants are entitled to a credit for that settlement." *Id.* (quoting *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 208 (1994)). This quoted portion came in a section of the court's opinion entitled "Joint and Several Liability with *Pro Tanto* Setoff." *Id.*

There has been no argument advanced—and no finding made—that the recoveries made by the Receiver came from joint tortfeasors. Indeed, the Receiver argues that "[t]he brokerage firms would hardly be joint or concurrent tortfeasors with David Dadante for the purchase and sale of a house using money he simply stole from the IPOF Fund." Receiver's Br. at 35. Under these circumstances, the one-satisfaction rule does not apply.

### Whether Mrs. Dadante is otherwise entitled to the funds

Mrs. Dadante also contends that the initial seizure of the funds in her account was "solely for the purpose of satisfying David Dadante's liability," and that because she is not a party to this lawsuit, she is entitled to rely on the Settlement Agreement's limitation of Dadante's liability to $8.5 million to cap any possible recovery by the Receiver. Beverly Dadante Br. at 14. Beyond this sum, she claims, "the Dadantes' property remained their own, regardless of its origin." *Id.* Moreover, she argues, the settlement agreement does not give the Receiver independent grounds on which to make a claim for the remaining funds in her account.

The parties focus on the settlement agreement between the Receiver and the Dadantes. There, David Dadante confessed to judgment in the amount of $8.5 million. Pursuant to section 3 of the agreement, the Dadantes also relinquished and disclaimed their interests in IPOF Funds. In partial satisfaction of the judgment, the Dadantes agreed to convey to the Fund their interest in their Gates Mills, Ohio residence.[17] Section 8 of the agreement stated that the Fund and its partners collectively released the Dadantes from "any and all claims, damages, causes of action, disputes,

---

[17] The house was later sold for $1.4 million.

controversies, expenses, charges, and liabilities of any nature whatsoever." *Id.* at PID 1586. In return, the Dadantes agreed to similar releases. However, Mrs. Dadante and the Fund excepted from the scope of the release any claims to the funds now at issue.

In light of the later evidentiary finding (a finding that Mrs. Dadante does not challenge on appeal) that the funds in the account are traceable to misappropriated Fund money, the settlement agreement does not appear to be an impediment to finding that Mrs. Dadante is not entitled to the return of these assets. The settlement agreement specifically carved out the money in the account from the agreed releases. Finally, her argument that the Fund's sale of the recovered stock should be applied toward the agreed-upon $8.5 million judgment ignores that the shares were never Dadante's assets. They belonged to the Fund and its investors. The return to the investors of their own property hardly justifies a set-off in the judgment amount that Dadante agreed to pay for the additional injuries he caused through his fraud. There has been no showing made that the value of assets he paid towards the judgment have approached $8.5 million. For these reasons, the district court did not err in denying Mrs. Dadante's motion for the release of assets.[18]

**IV.**

For the foregoing reasons, we **AFFIRM** the district court's order authorizing the payment of billed-but-unpaid fees, its order denying Mrs. Dadante's motion for release of funds, and its order awarding additional compensation to the Receiver and his staff from March 3, 2014 forward, but we **REVERSE** the portion of the district court's order awarding the Receiver and his staff

---

[18] To be clear, Mrs. Dadante is still entitled to the $3,346 that the district court found could not be tied to misappropriated Fund money. The district court ordered the Receiver to distribute that money to her. He plans to do so when the final distribution is made. Though the Receiver notes only that he plans to distribute the $3,346 in conjunction with the final distribution, Mrs. Dadante is also entitled to the accrued interest on that sum.

additional compensation before that date. We **REMAND** for further proceedings consistent with this opinion.